HARRILL v. RAILROAD CO.

(Filed May 27, 1904).

1. RAILROADS—*Partnership—Negligence—Questions for Jury.*

   In an action against a railroad company for wrongfully causing the death of an engineer, the question whether it and another road were partners in operating the part of the road on which the deceased was killed was properly submitted to the jury.

2. RAILROADS—*Partnerships—Negligence—Contracts.*

   A railroad corporation operating a road jointly with another corporation is responsible for injury to its employees, as a natural person would be for the liabilities of a firm of which he is a member.

3. CONTRIBUTORY NEGLIGENCE—*Assumption of Risk.*

   In this action against a railroad company for wrongfully killing an engineer the instructions as to assumption of risk and contributory negligence are correct.

MONTGOMERY, J., dissenting.

ACTION by R. N. Harrill against the South Carolina and
Georgia Extension Railroad Company, heard by *Judge B.
F. Long* and a jury, at September Term, 1901, of the Supe-
rior Court of RUTHERFORD County. From a judgment for
the plaintiff the defendant appealed.

*E. J. Justice* and *Busbee & Busbee,* for the plaintiff.
*P. J. Sinclair, G. W. S. Hart* and *N. W. Hardin,* for the
defendant.

CONNOR, J. The plaintiff alleged that his intestate, Jake
Metcalf, was, on and before April 20, 1901, employed by
the defendant as a locomotive engineer, and was on said day
engaged in running an engine carrying cars from Blacks-
burg, S. C., to Marion, N. C. That while so engaged he
was killed by the falling of a bridge or trestle, being a part
of defendant's track over Buffalo Creek in South Carolina.
That said trestle was on said day, by reason of defendant's
negligence, in a defective and dangerous condition and by
reason thereof gave way and fell, causing the death of his
intestate. Defendant denied that plaintiff's intestate · was
on the day named employed by or engaged for the defendant
in pulling a train from the points named in the complaint.
The defendant also denied the allegation of negligence, and
averred that plaintiff's intestate assumed the risk of crossing
the trestle and was guilty of contributory negligence. At
the conclusion of the plaintiff's testimony defendant moved
for judgment of nonsuit for that: 1. The plaintiff has failed
to show that the defendant company, the South Carolina and
Georgia Extension Railroad Company of North Carolina,
ran its train, built, or is required in law to maintain the
trestle over Buffalo Creek in South Carolina, or that the
plaintiff's intestate was employed by defendant company.
2. That there was no evidence of negligence on the part of

HARRILL *v.* RAILROAD CO.

defendant.    3. That plaintiff's evidence demonstrated that his intestate was not without fault, and that he came to his death by his own negligence.    The motion was refused and was renewed, upon the same grounds, at the conclusion of the entire testimony, and again refused and defendant excepted.

The Court submitted the following issues to the jury: 1. "Was plaintiff's intestate employed and sent by defendant on April 20, 1901, as engineer for the purpose of running an engine and cars attached from Blacksburg, S. C., to Marion, N. C., over Buffalo Creek trestle, as alleged in the complaint?"    2. "Was intestate killed by the wrongful act and negligence of defendant, as alleged?"    3. "Did intestate, by his own negligence, contribute to his death?"    4. "What damage, if any, is plaintiff entitled to recover?"

The controversy in regard to the relation which the plaintiff's intestate bore to the defendant company is presented by the first ground assigned for the motion to nonsuit, and certain special prayers for instruction asked by defendant. An examination and settlement of this question lies at the threshold of the case.    If the plaintiff has introduced no evidence to sustain the allegation that his intestate was in the employment of the defendant company, and that by the terms of such employment he was required to run his engine over and across Buffalo Creek on the day he was killed, the motion for nonsuit should have been allowed.    The testimony in regard to the status of the defendant and its relation to the South Carolina corporation owning the railroad to the North Carolina line is certainly unsatisfactory.    To correctly understand the status of the defendant corporation it becomes necessary to state, as concisely as possible, its history and relation to certain other corporations.    The General Assembly of this State, at its session of 1887, chapter 77, consolidated the Charleston, Cincinnati and Chicago

Railroad Company, a South Carolina corporation, with two North Carolina corporations, creating the C., C. & C. Ry. Co., a North Carolina as well as a South Carolina corporation, operating a railroad from Marion, N. C., to Blacksburg, S. C. This railroad, with all of its property rights, franchises, etc., in both States, was sold under foreclosure proceedings in the Circuit Court of the United States, and was, by the purchaser, incorporated under the corporate name of O. R. & C. Ry. Co. *Bradley v. Railroad,* 119 N. C., 918, Appendix.

This last-named corporation executed certain mortgages which were foreclosed pursuant to a decree of the Circuit Court of the United States for the Western District of North Carolina, and the property rights, franchises, etc., purchased by Samuel Hunt and others. Pursuant to sections 697, 698 and 2005 of The Code, the purchasers formed a new corporation under the name of the South Carolina and Georgia Extension Railroad Company of North Carolina. At the session of the General Assembly of 1899, Public Laws, chapter 35, the Legislature incorporated said company under said name, conferring upon it all of the rights, powers and privileges, franchises and immunities that at any time belonged to the Charleston, Cincinnati and Chicago Railroad Company, or to the Ohio and Charleston Railway Company of North Carolina, or to the Ohio River and Charleston Railroad Company, or to any or all of their predecessors. The said corporation was authorized to operate and maintain a railroad from the said line on the county line of Cleveland County to the town of Marion in the State of North Carolina, and was authorized and empowered to assign or lease its franchises, rights and property and to consolidate with any other corporation organized under the laws of this or any other State. The manner in which said consolidation shall be made, and the evidence thereof, is fully

set forth in section 8 of chapter 35 of said act, which was ratified January 31, 1899. On the 18th of August, 1898, the South Carolina and Georgia Extension Railroad Company of South Carolina was chartered, which charter was confirmed by the Legislature of South Carolina on the first day of March, 1899. The same persons, except P. J. Sinclair, are named as directors of the South Carolina corporation. The Constitution of South Carolina forbids any foreign corporation to do business there without the consent of the Legislature of that State. There was no evidence that said corporation had consolidated in accordance with the provisions of section 8, chapter 35, of the Laws of 1899. There was no other line of road running from Marion, N. C., through Rutherford and Cleveland counties to the South Carolina line than the one which extends to South Carolina and across to Blacksburg. It appeared in evidence that the intestate was employed by the *South Carolina and Georgia Extension Railway Company.* This was shown by vouchers and checks issued to the said intestate drawn upon the National Union Bank, Rock Hill, S. C., The National Bank of Gaffney, Gaffney, S. C., Merchants and Planters Bank, Gaffney, S. C., or B. Blanton & Co., Bankers, Shelby, N. C. There was also evidence tending to show that the run of said intestate was from Blacksburg, S. C., to Marion, N. C., and return; that he had been making this run for about two years; that he was working for the same company during this time. His widow testified that he was working on the road which operated trains in North Carolina from Marion along the line of what is known as the "Three C road"; that he had the rule book and time tables issued by the South Carolina and Georgia Extension Railroad Company. It was in evidence on the part of the defendant that Thomas A. Smith was a section-master, having under his charge a portion of the road running from Blacksburg,

S. C., to Earle, N. C. It was further in evidence on the part of said witness that he had been section-master of said road eight or ten years; that three miles of his section was in North Carolina and three in South Carolina, including Buffalo Creek; that it was under one management and that he was employed by one company; that his employment covered the time of death of plaintiff's intestate. Another witness for the defendant testified that he was employed on said road and did not know he was working for but one company. It was further in evidence by W. M. Wilkie that on the 20th day of April, 1901, he was employed in repairing cars in the shop at Blacksburg for the South Carolina and Georgia Extension Railroad Company; that he had worked on trestles from Blacksburg, S. C., to Brushy Creek, N. C.; that Mr. Tripp was superintendent, Mr. Maxwell was supervisor of the track, Mr. Nutting was supervisor of the bridges and trestles. There was no evidence of the existence of any corporation by the name of the Georgia and South Carolina Extension Railroad Company.

The defendant denies "on information and belief" many of the allegations of the complaint in respect to the relation the plaintiff's intestate bore to the corporation. For instance, the fifth allegation of the complaint is, "That on the morning of April 20, 1901, the said intestate was sent out by defendant from Blacksburg, S. C., on his regular run with a train consisting of engine and tender, freight cars and passenger coach, as plaintiff is informed and believes." The answer is, "It denies on information and belief the statement of facts in the fifth paragraph of the complaint." It is very doubtful whether this answer to this very material allegation raised an issue. The Code, section 243, requires the answer to either deny each allegation or "any knowledge or information thereof sufficient to form a belief." However this may be, no question was raised in regard to it by the

plaintiff, and we notice it only as indicating the trend of the defendant's answer to the vital question as to its relation to the employment of the plaintiff's intestate. The entire testimony presents the very singular and anomalous spectacle of a railroad track, originally built and belonging to a corporation chartered by the General Assembly of two States, running and operating in both States a continuous line, being sold and the purchasers incorporating two companies of the same name, except that one is "of South Carolina" and the other "of North Carolina." The two roads are operated by persons who adopt the name of "The South Carolina and Georgia Extension Railroad Company." There is no evidence of any consolidation of the two corporations, or of any lease of the track of one company to the other. The two roads are operated by a common set of officers, the section assigned to one of the section-masters being one-half in each of said States. One superintendent, one inspector of cars, and, in general, one set of employees. The checks given to the plaintiff's intestate indicate that the road is operated from a common treasury. There is other testimony to the same effect. There is no more evidence that the plaintiff's intestate was employed by the South Carolina than by the North Carolina corporation. If the defendant's contention be sustained, we have the anomalous condition of employees operating a railroad with no responsible head, and no one responsible for injuries sustained by them, and no one responsible to the public for breach of contracts. There must be some explanation of this condition. The plaintiff served notice upon the defendant "to produce in a legal form, showing that it would be competent testimony, the charter of the South Carolina and Georgia Extension Railroad Company, and states that it is alleged by the plaintiff that there is no such legal charter and that there was an attempt at consolidation of the South Carolina and Geor-

gia Extension Railroad Company of South Carolina and
the South Carolina and Georgia Extension Railroad Com-
pany of North Carolina, which did not have the effect of
extinguishing the two former corporations and creating a
new one, but which made a partnership of the two former,
which did business under the name and style of the South
Carolina and Georgia Extension Railroad Company, it being
a partnership and not a corporation." There was no
response to this demand. There is but one possible theory
upon which the operation of these roads in the manner testi-
fied to by the witnesses for both plaintiff and defendant can
be explained. The plaintiff contends that there was testi-
mony competent to be submitted to the jury tending to show
that the two corporations were running and operating said
roads under an arrangement or agreement which, in law,
constituted them partners under the name of the South Caro-
lina and Georgia Extension Railroad Company, and asked
his Honor to submit this question to the jury, the defendant
objecting for that there was no evidence to sustain such
instruction. His Honor having refused the motion for non-
suit and submitted the question to the jury, the exception
to his refusal and instruction to the jury · raises the ques-
tion whether there was any evidence to sustain it. Among
other instructions, his Honor said to the jury: "There is
some evidence tending to show the corporation which is sued,
and which was chartered by the Legislature of North Caro-
lina, operated a railroad in North Carolina in 1899, 1900 and
1901, and that trains operated over this road at that time
passed into South Carolina and over Buffalo Creek daily.
Mrs. Metcalf testified, as the Court recalls, that her husband
was employed by the company so operating the trains in
this State, and that he was required as such employee in
the performance of his duty to go on to Blacksburg and over
this trestle. If you find from any evidence in this case

that the plaintiff's intestate was employed by the defendant and was required to go over the trestle at Buffalo Creek, in South Carolina, you will answer the first issue 'Yes.' " The defendant excepted to this instruction. "The jury will answer the first issue 'Yes' if they find from the greater weight of the evidence that the South Carolina and Georgia Extension Railroad Company of North Carolina and the South Carolina and Georgia Extension Railroad of South Carolina, under the name and style of the South Carolina and Georgia Extension Railroad Company, jointly or by mutual consent employed plaintiff's intestate and made it his duty as an engineer to run from Marion, N. C., to Blacksburg, S. C., on April 20, 1901, and operated trains over the railroad leading from Marion to Blacksburg as one company, with a common set of officers and a common treasurer, when the said South Carolina and Georgia Extension Railroad Company had not been incorporated according to law, and there had been no legal consolidation of the said two companies."

It is held by this Court in *Rocky Mount Mills v. Railroad Co.,* 119 N. C., 693, 56 Am. St. Rep., 682, that where two or more connecting roads have agreed among themselves to conduct business through their systems under the name adopted by them, and have so advertised to the public, and have so contracted with persons, that each road which is a party to such agreement is liable for the negligence of the other roads. In that case it appeared that certain connecting roads had entered into an agreement to receive and transmit freight under a through bill of lading, that they adopted the name and style of the "Atlantic Coast Dispatch," and issued bills of lading in that name. For the failure to promptly carry and deliver freight it was held that either of the roads to such agreement might be sued for damages. The Court, after discussing the question, says:

"Upon examination and reflection we are of the opinion that the defendants and their connecting lines are jointly liable, each for the others, on the contract before us, and that they are also entitled to the same immunity and privileges as if the contract had been made by the individual company sought to be charged under said contract, that is to say, that they are engaged in business as partners under the name of the 'Atlantic Coast Dispatch.' They are still common carriers, none the less so because they have certain stipulations. Having jointly agreed to conduct the 'All-Rail Fast Freight Line' business under the name above stated between the terminal points of their connections North and South, and having so informed the public and so contracted with the plaintiff, their true character is fixed by the law according to the nature of their business, and such character cannot be thrown aside by any declaration in the contract in relation to the consequences of liabilities attaching thereto." The Court again says: "Taking notice, as we are at liberty to do, that the numerous transportation lines in our country, connecting with each other, constituting continuous lines between localities, are important factors in the commercial life of the country, we can readily see that if the shipper should have to go to a distant State and find as best he can the negligent party and enforce his remedy against him there, then the expense and trouble would in many cases be ruinous. On the contrary, the carrier's remedy in a case like the present would be easy and speedy. The whole matter is this: The defendants and their associates have engaged in a public business in the manner described for mutual benefit and convenience, and attempted to avoid the legal consequences by adopting some fancy name and by stipulating for limitations on the liabilities incurred in the exercise of their privileges in such business."

It would seem clear that if two natural persons were found

using their common property jointly, permitting those in
the active control and management of it to make contracts,
collect moneys for its use and hold themselves out to the
public as authorized to so use it, the question as to whether
such use was the result of some agreement or partnership
would be submitted to a jury. It is difficult to conceive that
the president and directors of the two corporations would so
far abdicate their powers and fail to perform their duties
in respect to the property and franchises as to permit strang-
ers without authority to assume control of it, employ ser-
vants and agents to operate it, assume responsible duties to
the public, and, in short, to do all such things in respect to the
property as the corporations were authorized to do. This
will be the condition with which we are confronted unless
those who under the name and style of the South Carolina
and Georgia Extension Railroad Company have leased this
property from the corporations, or are operating it as their
property. In view of the entire evidence, we think that his
Honor properly submitted the question to the jury. It is
well known as a part of the history of this country that rail-
road companies do form traffic and passenger arrangements
and otherwise operate their property jointly for their com-
mon benefit. Usually this is done by virtue of special per-
mission granted by the Legislatures of the different States.
If it be done without such authority, and is *ultra vires* as
between the corporations and the public, they could not
escape liability to persons with whom they had formed con-
tractual relations by reason thereof. It does not appear that
the South Carolina and Georgia Extension Railroad Com-
pany is a legal entity or consists of anything more than a
corps of superintendents, section-masters, engineers and other
persons employed in operating a railroad. Surely such a
mythical personality may not stand to the front and prevent
the Court laying hold upon the real owners of the property

and, as the jury have found, real operators thereof, and fixing them with liability for breach of contracts. It would be but keeping the promise to the ear and breaking it to the hope to say to this engineer or his personal representative that the South Carolina and Georgia Extension Railroad Company is alone responsible for a defective condition of the bridge by which he lost his life. Questions somewhat analagous to this have come before the Court, and it has been uniformly held that the jury is the proper tribunal to pass upon and ascertain the real facts and fix real responsibility. In the case of *Muschamp v. Railroad Co.,* 8 M. & W., 421, the question was presented as to the liability of the defendant for loss of articles shipped over its own and other lines. *Lord Abinger, C. J.,* said: "The whole matter is therefore a question for the jury to determine what the contract was on the evidence before them." In *Bradford v. Railroad Co.,* 7 Rich. L., 201, 62 Am. Dec., 411, the Court held that in such cases it was a question for the jury to determine. In *Hart v. Railroad,* 8 N. Y., 37, 59 Am. Dec., 447, the Court said: "I am satisfied from this evidence that the refusal of the Judge to nonsuit the plaintiff was right. The Court charged the jury that it was for them to say whether it was proved that the defendant by its agents received the baggage and agreed to carry it to Troy, and on the decision of the motion for a nonsuit, after all the evidence was given, the Court stated it was a matter to be left to the jury. The Court was right, both in the charge and in the refusal to nonsuit. There were facts which it was proper to submit to the jury, who were the proper judges of the weight of evidence, and it would have been error to have refused so to submit them."

We think that his Honor's ruling in the matter was correct. The jury having found, under the instructions, that the defendant corporation was, together with the South Car-

olina corporation, operating the road jointly, of course it becomes responsible for the injury sustained by its employee in the same manner that a natural person would for the liabilities of a partnership of which he was a member. We have carefully examined his Honor's charge upon the second issue and find no error therein.

The principal contention is made upon the question of "assumption of risk" and contributory negligence. In respect thereto it is conceded that the law of South Carolina prevails. Mr. D. W. Robinson, a practicing attorney, residing in South Carolina, was examined as a witness in regard to the law of that State, and after testifying in regard to Article VIII, section 9, of the Constitution, was asked the following question: "If the jury should find that the engineer of a locomotive engine employed by a railroad company, while running a train across a trestle on the road of said company in the discharge of his duty as such employee, had lost his life by the trestle giving way on account of some defect in the trestle, and the engine falling through by the breaking down of the said trestle; would this, under the laws of South Carolina, render the railroad company liable in an action by the personal representative of deceased for damages for such death?" Ans. "Yes, sir." "Under the laws of South Carolina, would the defense by a railroad company to an action for damages by reason of the falling in of a trestle along the railroad track and the consequent death of the engineer, that the engineer knew of the dangerous condition of the trestle or had opportunity to know it, avail the railroad company anything? If not, why not?" Ans. "I do not think the defense of knowledge and assumption of risk in a case of this kind would avail the defendant, because the provision of the Constitution of South Carolina, Article IX, section 15, makes this defense of no avail, and this seems to be the construction placed upon this provision

by the courts of South Carolina." (The witness thereupon cites a number of cases decided by the Supreme Court of that State and proceeds to say): "But if this case is not covered by the provision of the Constitution which I have above quoted, then the law applicable to it, as construed in this State, is that the question whether or not the party is to be deemed to have assumed the risk from knowledge of the dangerous or defective character of the appliances, machinery, etc., which he uses, is a question for the jury. The cases already cited cover this doctrine." The witness was examined fully in regard to the law of South Carolina, and upon cross-examination said: "Any degree of contributory negligence, as this term is used by the Supreme Court of South Carolina, and properly understood, will defeat a recovery. The meaning of contributory negligence, as defined by the Supreme Court of South Carolina, is that kind of negligence of the plaintiff which is a direct and proximate cause of the injury combining and concurring with the defendant's negligence in the same matter causing the injury. Unless it is the direct and proximate cause, it is not contributory negligence within the meaning of the term used by the Supreme Court of South Carolina. The distinctions and doctrines applicable to a proper understanding of contributory negligence will be found in *Bodie v. Railroad* (S. C.), 39 S. E., 715, above referred to." His Honor read to the jury the constitutional provision and said: "If this trestle was dangerous in its construction, or in any other manner, as alleged in the complaint, and if the defendant company knew this and required and permitted its engineers in the performance of the duties of their employment to pass over it, then I charge you that such engineers would not be barred of their recovery in case of injury to them because they knew the trestle was thus defective." We think there was evidence to sustain this instruction. In regard to

the issue of contributory negligence, his Honor charged the jury as follows: "Contributory negligence in South Carolina does not apply to the use by an employee of a railroad company of defective ways of such company when the railroad company knew the ways were defective, and the employee was required by it to use such ways in the performance of his duty, and when there is but one manner or method of using the same, and the employee is injured in so using it. An employee of a railroad company cannot hold his employer liable for his wrongful acts done, not in obedience to his duty as such employee, but contrary to it. The Constitution of South Carolina does not go this far. It is not to be assumed that a man in his senses will heedlessly imperil his own life. Culpable negligence of the plaintiff's intestate, properly so-called, which contributed to the injury, must always defeat the action. But the nature of the primary wrong has much to do with the judgment, whether or not the contributive fault was of a negative character, such as a lack of vigilance, and was itself caused by or would not have existed but for the primary wrong. It is not in law to be charged to the injured one but to the original wrong-doer. See *Kirley v. Railroad,* S. E. Rep., June 24, 1902, page 774. If the jury finds that when the intestate, Jake Metcalf, on the morning of April 20, 1901, arrived at Buffalo trestle and was waved down by Tom Smith, the section-master, and they went together out on the trestle and Smith pointed out to Metcalf that the track of the railroad was out of order and the trestle was dangerous and unsafe waved him not to go over it, and told the intestate that the trestle was unsafe, or if it was apparently more unsafe and more likely to fall than usual, and this could have been detected by ordinary prudence, and Jake Metcalf did not exercise such prudence, and was thereby injured as the direct result thereof, you will answer the third issue 'Yes'; or if

he willfully killed himself, you will answer the third issue 'Yes.' You will answer the third issue 'No' if you find from the evidence that when Jake Metcalf arrived at the trestle over Buffalo Creek on the morning of April 20, 1901, he was flagged down by Tom Smith, the section-master, and told that the creek was high and that he wanted Metcalf to get out and examine the trestle, and he did so, and walked out on the trestle with Smith, and the track appeared to be in alignment and surface, and there was nothing the matter with the track or trestle so far as appeared from examination except the water was high and came up on the trestle as high as is represented by the red line on the picture (Exhibit 3), and that there was a raft above the trestle and that there was nothing further unusual about the track or trestle, and that Metcalf was left by Tom Smith to rely on his own judgment as to whether he should go on the trestle and was not warned not to go, and Metcalf believed he could go over it with as much safety as for some months before, and a man of ordinary prudence under like circumstances would have ordinarily so believed, and that Metcalf violated no rule or order of his employer in going on or over the trestle." Defendant excepted to the giving of these instructions.

We think there is no error in the instructions as given. The defendant asked for a number of special instructions, the larger part of which were given with certain modifications, which we have carefully examined, and which we think were correctly made. This case is before this Court for the second time and was argued at the last term. We have given it a careful and anxious consideration. It was argued with marked ability by eminent counsel on both sides. It is not for us to say what the verdict of the jury should have been, we can only pass upon the exceptions to

HARRILL *v.* RAILROAD CO.

his Honor's rulings upon questions of law, and as to them, for the reasons hereinbefore given, we find

No Error

MONTGOMERY, J., dissenting. The plaintiff brought this action to recover damages for the killing of his intestate through the alleged negligence of the defendant company. In the complaint it is alleged that the defendant is a domestic railroad corporation in North Carolina, and that the line of its road extends through Blacksburg, South Carolina, through Cleveland and Rutherford counties in North Carolina, to Marion, North Carolina; that his intestate at the time of his death was employed by the defendant as a locomotive engineer and was engaged in running an engine pulling a train from Blacksburg, S. C., to Marion, N. C.; that the defendant, in the exericse of due care, undertook to cross a high trestle over Buffalo Creek in South Carolina between Blacksburg and the North Carolina line and was killed by the falling in of part of the trestle, the trestle having been insecurely built and then in a bad condition to the defendant's knowledge. The allegation of the complaint is that the trestle over Buffalo Creek where the intestate lost his life is in South Carolina, and all of the evidence was to the effect that it was on the railroad track of the company organized and chartered in South Carolina as the "South Carolina and Georgia Extension Railroad Company of South Carolina." The act of incorporation of the defendant company, passed on the first day of February, 1900, chapter 35 of the acts of the General Assembly of 1899, shows that the defendant corporation was authorized to operate and maintain a railroad from the State line between the States of North Carolina and South Carolina, on the county line of Cleveland County, to the town of Marion in the State of North Carolina, and thence to the Tennessee State line.

It was admitted by both sides on the trial, and the admission was correct in law, that there is a presumption of law, in the absence of proof, where a corporation has authority to operate a railroad and the road is being operated, that the company authorized by the charter is in fact conducting its management, and the Court so instructed the jury. The plaintiff's intestate, then, having been killed in South Carolina on the road of the South Carolina and Georgia Railroad Company of South Carolina there is a presumption of the law that that company was operating its own road.

The defendant at the close of all the evidence renewed its motion to nonsuit the plaintiff upon the ground that the plaintiff had failed to show that the defendant company, the South Carolina and Georgia Extension Railroad Company of North Carolina, ran its train, built, or was in law required to maintain the trestle spanning Buffalo Creek in South Carolina, or that the plaintiff's intestate was employed by the defendant company. We think that the motion should have been allowed.

The first issue was as follows: "Was the plaintiff's intestate, Jake Metcalf, employed and sent by the defendant, on April 20, 1901, as engineer for the purpose of running an engine and cars attached from Blacksburg, South Carolina, to Marion, North Carolina, over Buffalo Creek trestle, as alleged in the complaint?"

After a careful scrutiny of all the evidence in this case, I find none to the effect that the intestate was either employed by the defendant company or that he was under its direction or orders on the 20th April, 1901—the day of his death. The only evidence offered by the plaintiff to prove that fact positively was the testimony of Mrs. Corrie Metcalf, the widow of the intestate. In her examination-in-chief she said that the intestate's "run" was from Blacksburg to Marion and return; that he had been working for the same company

all the time he was on that "run," and that the road on which he, as engineer, hauled trains was in North Carolina from Marion along the line of what was known as the "Three C road." On her cross-examination, however, she said that the name of the company that runs to Marion is the same as that company that runs to Camden, and that, of her own knowledge, she did not know what that name was—she only knew that their literature (referring to order book and the checks in which the intestate received his monthly wages) said it was. The checks and order book were shown in evidence. The checks were drawn at Blacksburg, S. C., by A Tripp, superintendent, and at the top of it was printed "South Carolina and Georgia Extension Railroad Company. Pay Roll No. 2."

The order book which was delivered to the intestate contained, as prefatory to the rules, the following printed statement: "No. 555. This book is the property of the South Carolina and Georgia Extension Railroad Company and is loaned to J. D. Metcalf, engineer, who hereby agrees to return it to the proper officer when called for, or upon leaving the service." He signed it. The evidence of that witness did not tend to show that the intestate was employed by the defendant company.

E. F. Dougherty, a witness for the defendant, on the other hand testified that at the time of the intestate's death he was train dispatcher of the South Carolina and Georgia Extension Railroad Company, and that the intestate on the day of his death was sent out by him from Blacksburg to Marion in charge of an engine and train; that he had never been employed or paid by the defendant company. There was a contention on the part of the plaintiff, both in this Court and in the Court below, that the defendant company and the South Carolina and Georgia Extension Railroad of South Carolina were either partners or joint operators of

the two corporations, using the name of the South Carolina
and Georgia Extension Railroad Company as the name
under which they operated their partnership or joint inter-
est business; and his Honor submitted that view to the jury
upon the following instruction: "The charter of the defend-
ant company, ratified on February 1, 1899, Acts 1899, page
129, provides that it may consolidate with any other com-
pany in this State or any other State, and it provides fur-
ther how such consolidation shall be effected, and that the
consolidated company shall be a legal corporation when cer-
tain papers mentioned in the charter should be filed with
the Secretary of State. If the jury find from the evidence
that these two corporations were doing business over the line
of road in North Carolina and South Carolina under the
name of South Carolina and Georgia Extension Railroad
Company, and there was no such corporation as this last
named concern, but that it was a combination of the two
corporations operated under a common set of officers and
from a common treasury, then the South Carolina Georgia
Extension Railroad Company of North Carolina would be
liable for torts as a joint operator of the property under the
name and style of the South Carolina and Georgia Exten-
sion Railroad Company."

The evidence on which that contention was submitted to
the jury was that trains of cars ran daily from Blacksburg
to Marion and returned; the testimony of Dougherty, who
said that he was the train dispatcher of the South Carolina
and Georgia Extension Railroad Company; that A. Tripp
was the superintendent of the same road; that Nutting was
supervisor of bridges and building; that Maxwell was super-
visor of roadway; that they all lived in Blacksburg, S. C.;
that the South Carolina and Georgia Extension Railroad
Company ran from Marion to Camden, and that he did not
know of any different company that ran from Marion to

HARRILL *v.* RAILROAD Co.

Blacksburg. The fact, too, that the act of Assembly incorporating the defendant company in North Carolina, and that of the South Carolina Legislature incorporating the South Carolina and Georgia Extension Railroad Company of South Carolina, with the same corporators in both, authorized each of the companies to lease, or lease to, or consolidate with, any other railroad company, and the fact that no such lease or consolidation had been made or effected, were relied upon to give color and force to the contention that, instead of a consolidation between the two companies, they had agreed upon a joint management of the business of the two roads and a division of the profits.

I cannot see how that evidence tends to prove the contention. If there had been no consolidation in law of the two companies, and there is no evidence that there had been, and the name of the South Carolina and Georgia Extension Railroad Company is a myth, the evidence tends rather to show that the South Carolina and Georgia Extension Railroad Company of South Carolina is the real power which is operating the defendant road, for the officers who control it live in South Carolina on its line of railway, and its trains start from Blacksburg and return the same day, and the defendant company has no cars or engines. To me it seems that the defendant company has no part in the actual management of its road, and if it is interested in the profits there is no evidence of it.

I think there ought to be a new trial.