Argued October 30, affirmed December 5, 1916.

# CLAYTON *v.* ENTERPRISE ELECTRIC CO.*

### (161 Pac. 411.)

**Statutes—Construction—Intention of Legislators.**

1.  Where the language of the lawmakers is plain and their intent clear, such meaning must be given effect.

**Electricity—Regulation—Construction of Statutes.**

2.  The title of the employers' liability law (Laws 1911, p. 16) indicated that the act provided for the protection and safety of persons engaged in construction or other work upon buildings and other structures, or upon or about electrical wires, conductors or other electrical appliances carrying a dangerous current of electricity, or about any machinery or in any dangerous occupation, and defining the liability of employers for acts of negligence, or for the injury or death of their employees. Section 1 provided that all persons whatsoever engaged in the manufacture, transmission and use of electricity should see that all material was carefully selected, inspected and tested, and that in the transmission and use of electricity of a dangerous voltage full and complete insulation should be provided at all points where the public or the employees were liable to come in contact with the wires, and that all persons having charge of or responsible for any work involving a risk or danger to the employees or the public should use every device, care and precaution which it is practicable to use for the protection of life and limb. Section 4 made any person within the provisions of the act. liable for any loss of life by violation thereof. *Held,* that the act was intended to safeguard members of the public from coming in contact with wires carrying a dangerous current, and was not limited to the protection of the immediate employees of electric companies.

**Statutes—Validity—Title.**

3.  The provision of the law protecting the general public is not foreign to nor disconnected with the subject embraced in the title. The title was sufficient to direct the voters' attention to the measure to be acted upon, was not inconsistent with the general object and purpose of the initiative and referendum amendments to the constitution, and the statute is not invalid under Article IV, Section 20, of the Constitution.

**Statutes—Validity—Title.**

4.  To render a portion of a statute invalid because its provisions are not embraced within the title, as required by Article IV, Section 20, of the Constitution, the provisions must be entirely disconnected with the subject, wholly incongruous, and consist of matter of which the title gives no notice, so that the adoption of the measure by means of the title would be fraudulent.

---

**Constitutional Law—Validity of Statute—Presumption.**

5. The presumption is always in favor of the validity of the statute, and its repugnancy to the Constitution must clearly appear.

**Electricity—Actions for Injury—Sufficiency of Evidence—Ownership of Wires.**

6. In an action for the death of an employee of a patron of an electric power company, when he attempted to turn off the switch in his employer's pumping plant, evidence *held* sufficient to take to the jury the question whether the power company owned and controlled the wires and switch.

**Electricity—Degree of Care Required.**

7. The care demanded of electric companies must be commensurate with the danger, and where their wires are carrying a dangerous current, the law imposes upon them the utmost degree of care in the construction, inspection and repair.

[As to duties and liabilities of electrical companies, see note in 100 Am. St. Rep. 515.]

**Electricity—Liability of Company—Ownership of Switch.**

8. Where an electric power company furnishes the current for operating a pump owned by an individual, and owns the wires leading to the switch, which was installed by the company's predecessors, the company can exercise control over the switch, even if it does not own it, and is liable under the employers' liability law if the switch is defective.

**Electricity—Liability of Companies—Installation of Apparatus.**

9. Where an electrical company undertakes to render service to a customer, and runs its wires into a building, and installs its apparatus therein, it must exercise a degree of care commensurate with the risk in protecting and insulating its wires and installing the apparatus.

From Wallowa: JOHN W. KNOWLES, Judge.

In Banc.     Statement by MR. JUSTICE BEAN.

The plaintiff, Ella Clayton, as the widow of W. S. Clayton, deceased, brings this action for damages under the employers' liability law against the defendant, to recover for the death of her husband, caused by an electric shock which he received while attempting to turn off the power furnished by the defendant to a motor pump operated by one Carl Roe, by whom he was employed. Without quoting the allegations of the complaint, it may be stated that on August 5, 1912, the defendant, Enterprise Electric Company, a corporation, was engaged in the manufacture, transmission

and use of electricity of a dangerous voltage. At the time one Carl Roe was the owner of a pumping plant on the Wallowa River, a short distance below the town of Enterprise, and was engaged in pumping water from that river to irrigate certain lands situated above the stream. The pumping plant, machinery and motor for the same were contained in a small lumber building about 9x18 feet. Prior to the date mentioned, under an arrangement with Roe, the defendant had connected its wires and transmission system, upon which a dangerous voltage of electricity was being carried, with the motor and machinery of this pumping plant, and had placed thereon certain switches and other apparatus. Plaintiff alleges that the defendant was the owner and controlled and operated the transmission system, and the wires and appliances by which the currents of electricity were carried into and connected with the motor and pumping machinery, and was engaged in furnishing the pumping plant with electricity, conveying the same to the motor by the wiring, switches and apparatus. Omitting the part of the complaint not relied upon at the trial, plaintiff claimed that the defendant was negligent in the following respects:

"(1) That the defendant being the owner of and controlling and operating the transmission system and the wires and appliances by which the electric currents were carried into and connected with the motor in the pumping plant owned by Carl Roe, carelessly and negligently failed to cover and inclose the dangerous machinery, switches and wiring by means of which said electricity was connected with said motor.

"(2) That the defendant, being the owner of and controlling and operating said transmission system and said wires and appliances by which said electricity was conveyed from said transmission system to said motor, carelessly and negligently failed thoroughly,

effectively and perfectly to insulate said wiring, switches and apparatus. * *

"(5) That the defendant carelessly and negligently used an insufficient and dangerous switch, the blades of which were not insulated, and negligently failed to use a fully insulated switch at a point where the public and the employees of Roe were likely to come in contact with the same, though a fully and completely insulated switch was practicable to be used without interfering with the efficiency of the pumping plant."

On the day mentioned, while in the employ of Carl Roe, W. S. Clayton, deceased, was required to attend to the operation of the pumping plant, turn off and on the electric power, set the plant in operation, and stop the same again as required by the business. In the afternoon of that day it became his duty to turn off the power, and in order to do so he entered the building and turned off the electricity from the motor, by opening the switch and disconnecting the wiring and transmission plant of the defendant with the same. While attempting this, by reason of the negligence of the defendant, as set forth, he received a violent shock of electricity from the wiring, switches and apparatus of the defendant and the high and dangerous current, voltage and amperage of electricity passed through his body killing him.

The answer of defendant denied the allegations of negligence contained in the complaint and affirmatively set forth contributory negligence on the part of Clayton. It also alleged affirmatively that at the time of the accident the defendant was not the owner of, did not have the right to, and did not exercise any supervision, control or direction over, the interior of the pumping plant or building, or over any of the machinery, switches, apparatus or appliances installed therein, and that it owed no duty to plaintiff's deceased.

The reply put in issue the affirmative matter of the answer, except the allegation that W. S. Clayton was not in the employ of the defendant at the time of his death.   The cause was tried before a jury, resulting in a verdict in favor of plaintiff for the sum of $5,000, upon which judgment was entered, from which judgment this appeal is prosecuted.          AFFIRMED.

For appellant there was a brief over the names of *Mr. A. S. Cooley* and *Messrs. Griffith, Leiter & Allen,* with an oral argument by *Mr. Rufus A. Leiter.*

For respondent there was a brief with oral arguments by *Mr. Daniel Boyd* and *Mr. Alfred S. Bennett.*

MR. JUSTICE BEAN delivered the opinion of the court.

The defendant raises but three points upon this appeal, and relies upon three assignments of error: (1) Overruling the defendant's demurrer to plaintiff's complaint; (2) denying plaintiff's motion for a nonsuit; (3) refusing to instruct the jury to return a verdict for the defendant.   These points may be considered together.   The main question involved is presented as a new one.   It is contended on the part of the defendant: First, that the employers' liability law applies only to the relationship of employer and employee, and does not create any right of action in a member of the general public; second, that the title of the act is not broad enough to include protection to members of the general public, and if it is that subject is not expressed in the title; and third, that Article IV of Section 20 of the state Constitution was not complied with, and the act to that extent is not constitutional, within the rule announced in *State* v.

*Richardson,* 48 Or. 309 (85 Pac. 225, 8 L. R. A. (N. S.) 362).

1, 2. The title of the employers' liability law (Gen. Laws 1911, p. 16) is as follows:

"An act providing for the protection and safety of persons engaged in the construction, repairing, alteration, or other work, upon buildings, bridges, viaducts, tanks, stacks and other structures, or engaged in any work upon or about electrical wires, or conductors or poles, or supports, or other electrical appliances or contrivances carrying a dangerous current of electricity; or about any machinery or in any dangerous occupation, and extending and defining the liability of employers in any or all acts of negligence, or for injury or death of their employees, and defining who are the agents of the employer, and declaring what shall not be a defense in actions by employees against employers, and prescribing a penalty for a violation of the law."

That part of the act necessary to here note reads thus:

Section 1: "All owners, contractors, subcontractors, corporations or persons whatsoever engaged * * in the manufacture, transmission and use of electricity, or in the manufacture or use of any dangerous appliance or substance, shall see that all metal, wood, rope, glass, rubber, gutta percha, or other material whatever, shall be carefully selected and inspected and tested so as to detect any defects. * * And in the transmission and use of electricity of a dangerous voltage full and complete insulation shall be provided at all points where the public or the employees of the owner, contractor or subcontractor transmitting or using said electricity are liable to come in contact with the wire, * * and generally all owners, contractors or subcontractors, and other persons having charge of, or responsible for any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practica-

ble to use for the protection and safety of life and limb. * * ''

Section 4: "If there shall be any loss of life by reason of the neglects or failures or violations of the provisions of this act by any owner, contractor, or subcontractor, or any person liable under the provisions of this act, the widow of the person so killed, his lineal heirs or adopted children,'' etc., "shall have a right of action without any limit as to the amount of damages which may be awarded.''

From the language of the statute, which makes three special references to the safety of the general public, or the public, it seems there can be no doubt but that the provisions of the law are intended to safeguard members of the public from injury by coming in contact with wires or appliances owned and controlled by an electric company and used in the transmission and application of electricity of a dangerous voltage. It is a cardinal principle of statutory construction that, where the language of the lawmakers is plain and its intent clear, such meaning shall be given effect. That the provisions of the employers' liability law are more frequently applied to affairs between employer and employee does not lessen its force, so far as applicable, in prescribing a rule of conduct for those engaged in dealing with such a dangerous and subtle element as electricity, in order to increase the safety of those who in the performance of their duty are liable to come in contact with the agencies employed in generating and conveying such current, even though such persons may not be in the immediate employ of such manufacturer or person conveying electricity.

The act first enjoins upon the owner, corporation or person engaged in the manufacture, transmission and use of electricity the duty of seeing that all material shall be carefully selected, inspected and tested so as

to detect any defects; second, it commands that, in the transmission and use of electricity of a dangerous voltage, full and complete insulation shall be provided at all points where the public or the employees of the owner, etc., are liable to come in contact with the wire; and, third, generally, as though to leave no doubt or room for escape, the law requires that such owner or person in any work involving a risk or danger to employees or the public shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machinery or other apparatus or device, and without regard to the additional cost of suitable material or safety appliances or devices. It is not necessary to decide under which of the three classes referred to the facts in the case shall be classed. The first and last seem to be particularly applicable. The general clause appears to be intended to cover all cases relating to the care required in the control of electricity, not coming within the specifications of the second class. The title of the act plainly shows the purpose, more fully set forth in the body of the act, to protect all persons working around high voltage wires, without regard to whether they are employees of the electric company or not. The enactment is for the protection of life and limb, and should be given a fair and liberal construction in the interest of public safety and protection of human life: *Blair* v. *Western Cedar Co.*, 75 Or. 281 (146 Pac. 480).

3, 4. The next question is: Is the act repugnant to our Constitution in so far as it applies to any other than the relationship of employer and employee? In order to render a portion of a statute invalid for the reason that its provisions are not embraced within

the title of the act in conformity with Article IV, Section 20, of the Constitution, such provisions must be entirely disconnected with the subject as embraced in the title, wholly incongruous, and consist of matter of which the title gives no notice, so that the adoption of such measure by means of the title would be fraudulent.

5. The presumption is always in favor of the validity of a statute, and its repugnancy to the Constitution must clearly appear. If the matter is reasonably connected with and germane to the title under our Constitution requiring an act to embrace but one subject and matters connected therewith, which subject must be embraced in the title, the law will be upheld: *State* v. *Shaw,* 22 Or. 287 (29 Pac. 1028); *Clemmensen* v. *Peterson,* 35 Or. 47 (56 Pac. 1015); *Pacific Elev. Co.* v. *Portland,* 65 Or. 349 (133 Pac. 72, 46 L. R. A. (N. S.) 363). The employers' liability law was proposed by initiative petition and adopted by the electors of the state. If it be assumed that the same rule would apply to it as to a legislative enactment, we think the title of the act is broad enough to include the protection of all persons who are from necessity liable to come in contact with the electric wires charged with a dangerous voltage of electricity. It cannot be held that the part of the law to which reference has been made is foreign to or disconnected with the subject embraced in the title. The title to the act was sufficient to direct the voters' attention to the measure to be acted upon and was not inconsistent with the general object and purpose of the initiative and referendum amendment to the Constitution. No fraud was perpetrated upon the voters by virtue thereof: *State* v. *Langworthy,* 55 Or. 309 (104

Pac. 424, 106 Pac. 336). The enactment is not inimical to the Constitution, and is valid.

6. It is argued by the learned counsel for the defendant that the apparatus complained of in the present case was under the control of Roe; and an electric power company furnishing current is not bound to examine nor inspect fixtures or appliances used by its customers and under their supervision. The evidence introduced tended to show substantially the following facts:

The defendant, a public service corporation, was engaged in generating electricity and furnishing it to the public, either to houses and places of business, or on the streets as there might be a demand. Carl Roe, the employer of the decedent, was engaged in operating a pumping plant on the banks of the Wallowa River by which water was pumped to the hill. The power for the plant was furnished by the defendant company. When Roe got his motor installed and lined up, he notified the electric company, which was then owned by a partnership consisting of Mr. Forsyth and Mr. Haas. The latter leased his interest in the plant to Forsyth, who was the sole manager of the concern, and who proceeded to connect up the line with the pumping plant. He wired about 150 feet from the main line to the building in which the pump was situated. He put in the wires connected with the switch, which was located just inside of the building, and also installed the switch itself and the wire extending from it to the motor. The evidence as to who actually owned and controlled the switch is conflicting. It was picked up and put together from two old switches. Neither party seems willing to claim the ownership. Before the installation thereof the wire and the switch had been owned by the electric

company. At the time Roe was altogether ignorant of electricity and the company knew that fact. There was no transformer or meter used, and the full current generated by the electric company for the purpose of furnishing the City of Enterprise with electricity and power was intended to pass over the line and through the motor. The pump was not supposed to run in the evening, however, when all the lights of the city were on. The usual voltage on the line was 2,300 volts, which was a high and dangerous current, necessarily fatal to any human life subjected to it.

The system used by the electric company was a three-wire or three-phase current, and the switch placed in the building was not an oil switch nor insulated in any way. It was a jack-knife switch, having blades about fifteen inches long and about nine or ten inches across, and which were entirely bare and uninsulated. When the switch was turned on or off, one coming in contact therewith—that is, with that portion next to the wire extending toward the main line—would receive a shock. While these switches were appropriate for a low current, where there was no danger to life or limb, they were not suitable for such voltage as was carried over the wires in question. They were exceedingly dangerous if anyone came in contract with them. When the switch was opened and closed, fire would frequently flash for a distance of three or four inches from the switch. An oil switch, such as is usually used on high-voltage wires, would have entirely insulated the wire and the current, and would have been much safer for the operator. On account of the danger a stick about three or four feet long had been prepared to hook over the handle of the switch and pull it open and shut. Clayton was entirely ignorant in relation to electricity.

He had turned the current off and on only a few times prior to the occurrence causing his death. On that date he went down late in the evening to shut off the motor. The building in which it was contained was situated at the front of a steep hill partly surrounded by brush and trees. There were no windows in the building and the only means of light was the door in front. In some way the decedent attempted to disconnect the wire carrying the current to the motor, and got against the uninsulated blades of the switch, and the whole current passed through his body, causing instant death. It was apparent, from the burns on his hand and on his leg, that he got against the uninsulated appliance.

It is claimed by plaintiff, and the jury must have so found, that defendant owned and controlled the current of electricity and transmitted it to the motor operated by Roe; that it also controlled and owned the wiring and switch carrying the current to the motor, at least as far as to the switch. The evidence tended to show that as a general rule an electric company owns and controls the line of wires to the meter where there is one, and where there is none to the switch or fuse blocks, which are usually combined, and that the pumping plant was located upon the land with the consent of Mr. Forsyth, the manager of the electric plant. The trial court submitted to the jury the disputed questions of fact relating to the switch and appliances by instructions of the import of the following charge:

"If you find from the evidence that the defendant did not have the right to, and did not, exercise any supervision, dominion, control or direction over the appliances, apparatus or switches in said pumping plant, but that the right to exercise such supervision, dominion, control and direction was vested in the owners of the pumping plant, or persons other than

the defendant, then I instruct you that the defendant would not be liable for any accident caused by the condition of any such apparatus, switches, or appliances.''

7. The care demanded of electric companies must be commensurate with the danger, and where their wires are carrying a high and dangerous current of electricity, the law imposes upon the company the utmost degree of care in the construction, inspection and repair, so as to keep them in a safe condition at places where persons are liable to come in contact with them: *Perham* v. *Portland E. Co.*, 33 Or. 451 (53 Pac. 14, 24, 72 Am. St. Rep. 730, 40 L. R. A. 799) ; *Gentzkow* v. *Portland Ry. Co.*, 54 Or. 120 (102 Pac. 614, 135 Am. St. Rep. 821) ; *White* v. *Elec. Co.*, 75 Wash. 139 (134 Pac. 807) ; *McLaughlin* v. *Light Co.*, 100 Ky. 173 (37 S. W. 855, 34 L. R. A. 812) ; *Commonwealth Elec. Co.* v. *Melville,* 210 Ill. 70 (70 N. E. 1052, 1055). The question as to whether the defendant company owned and controlled the wires and switch at the point where the injury occurred, and whether or not it at the time transmitted electricity over the same to the motor, were questions for the jury: *Taffe* v. *Oregon Ry. & N. Co.,* 60 Or. 177 (117 Pac. 989).

8. About the question of control, let us suppose that an irrigation company was owning and operating a water ditch, and furnishing water to users for the purpose of irrigating lands, would it be said that such company could deliver its water and perform its duty by allowing the same to flow in its canal and out into the lateral ditch of a water user, without any gate or other contrivance to control the outflow? Or would such a company be required, even in the absence of a statute specifically directing the same, to establish a gate or means of controlling the discharge of the

water from its ditch, so as to keep the quantity within a limit that would not ordinarily cause damage? Would not such a company be responsible for the management and control of such water until the same was delivered out through its gate onto the land of the owner? Could such an irrigation company say it was the duty of the user to supply the gate? In the present case the switch in question served a purpose similar to such a headgate, and it seems to us to mark the line of control and responsibility of the furnishing company. Indeed, it is stated in the brief of the learned counsel for the company that the defendant's control over the current ceased at the switch, contending, however, that the switch was no part of the transmission system. On the other hand, plaintiff asserts that it would be a mighty technical holding, if the defendant so owned the wire to the switch, to hold that it was not liable for the switch itself, which was directly connected with and part of the wire, which left the wire practically uninsulated at that end. It is contended upon the part of plaintiff that, if the jury should have found that the electricity was delivered at the switch, it would be a case of joint control, where either party would be responsible for injuries occurring at that point, and would be similar to two railroads having a joint depot at the junction, where both are or either is résponsible for any defective condition of the surroundings: *Louisville etc. Ry. Co.* v. *Lucas*, 119 Ind. 583 (21 N. E. 968, 6 L. R. A. 193); *Lucas* v. *Pennsylvania R. R. Co.*, 120 Ind. 205 (21 N. E. 972, 16 Am. St. Rep. 323); *Harrill* v. *South Carolina etc. R. R. Co.*, 135 N. C. 601 (47 S. E. 730); *Robinson* v. *Chicago etc. R. R. Co.*, 135 Mich. 254 (97 N. W. 689); *Wabash etc. Ry. Co.* v. *Wolff*, 13 Ill. App. 437; *Herrman* v. *Great Northern Ry. Co.*, 27 Wash.

472 (68 Pac. 82, 57 L. R. A. 390); *Seymour* v. *Railway Co.,* 3 Biss. 43 (21 Fed. Cas. 1113); *Watson* v. *Railway Co.,* 92 Ala. 320 (8 South. 770); *Louisville etc. Ry. Co.,* v. *Treadway,* 142 Ind. 475 (40 N. E. 807, 41 N. E. 794).

9. It may be explanatory to state the general rule beyond the point of delivery or switch, which we find in 1 Joyce, Electrical Law, Section 445b, as follows:

"Though an electrical company is not an insurer, yet where it undertakes to render service to a customer, and for this purpose runs its wires into a building and installs its apparatus therein, it is under the obligation, both in doing this and in maintaining the wires and apparatus, to exercise a degree of care which is commensurate with the risks involved, having in view such injury as may result either from improperly protecting or insulating its wires or from improperly installing the apparatus. And this obligation cannot be avoided by the company by hiring someone else to do the work required."

The company was not required to connect its line of wires with an improper switch or other device, nor to maintain the same without proper connections: *First Nat. Bank* v. *Pacific Tel. & Tel. Co.,* 81 Or. 307 (159 Pac. 561). There were two ways for such installation: (1) For the company to furnish everything reasonably necessary and charge Roe therefor; or (2) to require Roe to procure the needed appliances at his own expense, which amounts to the same thing. The company is a public service corporation, and is entitled to compensation for whatever it does. The ownership of the appliance is not the controlling element. It cannot be supposed that an electric company would permit an independent person or concern to connect its wires with a motor like Roe's. Neither did this company delegate that duty to another, when the motor was installed and the connection made

for furnishing the power for pumping. There was nothing to prevent the defendant from supervising and controlling the switch and apparatus in the power-house. The case differs somewhat from that where an electric current to the amount needed, and not of sufficient voltage to be dangerous, is furnished for lighting a building. The case of *Dygert* v. *City of Eugene,* 72 Or. 1 (143 Pac. 643), is somewhat analogous. In that case the city and the electric company were successfully sued together for an injury caused by the hanging and maintaining of the city's wires too close to the heavily charged wires of the power company, by which the wires of the latter were overcharged, to the injury of the plaintiff, who was a customer of the power company.

Remarks which apply with much force to the case in hand were made by that eminent jurist, Presiding Justice BISSELL, in the case of *National Fire etc. Co.* v. *Denver Consolidated Electric Co.,* 16 Colo. App. 86 (63 Pac. 949), cited by defendant. In rejecting the contention that the electric company was liable for the imperfect and uninsulated condition of wires in a building to which it supplied electricity, although the company did not do the work of construction of the inside wires, he said:

"It is a matter of common knowledge, and in fact of universal knowledge, that an electric current is dangerous and must be discreetly and prudently handled in order to avoid danger either to life or to property. We are quite ready to concede that, when an electric light company undertakes to supply a dangerous current to a dwelling-house or to a building, they are bound to see that the wires they put in and the connections they make are properly insulated and protected, so that no harm will come to the property. Where, however, they are only employed to deliver the current by connection with wiring already made by

the individual who owns the property, it seems to us that their responsibility ends when the connection is properly made under proper conditions and they deliver the current in a manner which will protect both life and property.''

In the case at bar the connection between the electric wire of the defendant company which was indisputably placed, owned and controlled by it, and the wire inside the pump-house leading to the motor, the control of which is in dispute, was made by means of a switch which was in a dangerous condition and the immediate cause of the injury. This connection, gate or switch was not beyond the border line of the responsibility or control of the electric company. Whatever may be said about the control or liability for the management of the electric energy on the motor side of the connection or switch, or whoever may have borne the expense of the wiring next to the motor, or the installation of the delivering appliances or switch, under the statute of this state it was the duty of the electric company installing the switch and making the connection for power purposes to use every device, care and precaution which it was practicable to use for the protection and safety of life and limb in the transmission of this subtle and dangerous element. This duty is clearly enjoined upon it by the Employers' Liability Act, and cannot be evaded or lessened by showing that a few years ago, when the contrivance was installed, the consumer contributed the cost thereof, and in order to render the burden light, an old, dangerous, uninsulated and unprotected contrivance was permitted by the predecessor of the defendant company to be used as a switch. The evidence tends to show—in fact, it is practically beyond controversy—that the defendant company, in

the transmission of the electric power to be used in the pumping station and for other purposes beyond that place, which was of a dangerous voltage, failed and neglected to make use of an appliance such as a switch or device with full and complete insulation or protection, or to use a transformer, so as to make the same as safe as practicable in order to protect the lives and limbs of those who would necessarily be in close proximity to the same and were liable to come in contact therewith, especially the operator of the motor of the patron of the company.

There was no error in overruling the demurrer to plaintiff's complaint. Under the facts in the case the jury was warranted in finding a verdict against defendant, and there was no error in denying the defendant's motion for a nonsuit, or in overruling its motion for a directed verdict.

The judgment of the lower court will therefore be affirmed. AFFIRMED.